**DOANE AGRICULTURAL SERVICE, Inc., Reynold K. Hughes, dba Fayette Stock Farm, Appellants,**

v.

**A. W. COLEMAN, Appellee.**

**Nos. 13238, 13239.**

United States Court of Appeals Sixth Circuit.

April 4, 1958.

Emmett W. Braden, Memphis, Tenn. (Armstrong, McCadden, Allen, Braden & Goodman, Memphis, Tenn., on the brief), for appellant Doane Agricultural Service, Inc.

Don G. Owens, Memphis, Tenn. (Owens & McLain, Ramsay Wall, Shepherd, Heiskell, Williams, Beal & Wall, Memphis, Tenn., on the brief), for appellant Hughes.

Robert M. Burton, Memphis, Tenn. (James R. Winchester, Memphis, Tenn., on the brief), for appellee.

Before SIMONS, Chief Judge, and MILLER and STEWART, Circuit Judges.

SIMONS, Chief Judge.

Appellant Hughes was the owner of the Fayette Stock Farm, in Tennessee. Since his home was in Tulsa, Oklahoma, and he could give only intermittent supervision to the farm, he entered on December 6, 1955, into a management contract with Doane Agricultural Service, Inc., for the planning and execution of operations on the farm. By the terms of the writing, Doane was given the right to hire and fire all of the employees of the farm, including the utilization or nonuse of its tenant farmers, and had the right to supervise the work of all employees and tenants. It was to collect all revenues and pay all expenses out of such revenue. It was to determine the crops to be grown and where; the conservation of the soil by crop rotation, erosion

controls and soil treatment; it was to make plans for maintenance, repair, and removal of buildings, subject to approval by Hughes, and to report to Hughes regarding the progress of the work and condition of the farm. For this service, it was to receive a fee of $150.00 per month. The contract, however, provided that it was not to be the whole agreement between the parties but was only to outline broad duties, compensation, period of operation, and method of termination. Wages of employees were to be paid out of the farm's bank account by checks drawn by an employee of Doane. Hughes would make observations on the farm after Doane's plans had been submitted and approved by him and felt that he could get cooperation of Doane in making any changes.

Coleman lost his arm in a hay baling machine, on June 11, 1956, while in the employ of one Blaylock doing baling on the farm. He brought suit against both appellants; recovered against both in a trial to a jury and both appealed, their appeals being consolidated for hearing. The Coleman suit was based upon alleged negligence on the part of each of the appellants. The liability of Doane was grounded on the fault of Guarr, the farm manager, and one Mitchell who was on the baling machine when Coleman was injured and liability was imputed to Hughes on the theory that he was responsible for the acts of Doane and Doane's employees under the law of agency.

The accident to Coleman happened in this wise. While operating the baling equipment, on June 11, 1956, Coleman was advised by Guarr, the farm manager, that the bales were not being properly formed and was ordered by Guarr to get off the tractor, which provided the power to move and operate the baler, and let Mitchell get on the tractor and operate it, while Coleman made adjustments. Coleman obeyed and while observing operation by Mitchell discovered that a cord was not knotting properly. He asked Mitchell to disengage the clutch of the tractor which would stop its movement and also the operation of the baler. He then went to the baler to adjust the cord. He put his right arm in the rollers for that purpose and lost it. There is conflict in the evidence as to whether the rollers were moving at the time Coleman undertook to make the adjustment or whether they were stopped. The Court submitted this issue to the jury which, by its verdict, necessarily found that the injury to Coleman resulted proximately from some fault of Mitchell, or of Guarr, or both; Guarr's fault being its order to Coleman to leave the tractor and installing Mitchell thereon, Mitchell being inexperienced in the operation of the baler.

■ Both Doane and Hughes allege contributory negligence on the part of Coleman, charge that he assumed the risk of injury when he approached the baler, and that Mitchell was a fellow servant of Coleman. They argue that the record establishes these defenses as a matter of law and that they should not have been submitted to the jury for determination. It may be true, of course, that where facts are undisputed or permit of only a single inference, a question of law arises but, where the facts are in dispute, their ascertainment is, upon recognized principles, a question for the jury and we find no error in submitting to the jury to determine what really happened, as disclosed by or reasonably to be inferred from the evidence.

Blaylock was clearly, upon this record, an independent contractor. He was in the business of baling hay for those who wished his services, furnishing his own equipment, and Coleman was his employee sent to the farm to run the baling machine. He had been engaged by Guarr, the farm manager, and the question presented is, "By whom was Guarr employed?" There is evidence that he was engaged by Doane, through its independent action, notwithstanding approval by Hughes at a later date. Under the terms of the contract and its practical construction Doane had exercised his right to hire and fire employees. Doane's contention that Guarr was the employee of Hughes, as a matter of law, must be

rejected. So, too, with Mitchell, who as an employee on the farm was retained by Doane, when it took over management of the farm. The jury was warranted in finding as a fact that Guarr and Mitchell were the employees of Doane.

■ The contention that Mitchell was a fellow servant of Coleman is without support in the record. Coleman was the employee of Blaylock. There is no evidence that Blaylock, either individually or through Coleman, exercised any control over Mitchell. There is no evidence that Blaylock hired him, or paid him, or, so far as the record shows, even knew him. Such orders as were given to Mitchell to operate the tractor emanated from Guarr and the Fellow Servant Rule contended for by Doane is clearly without application here.

■■ There was no evidence upon which the jury could find that there was assumption of risk by Coleman. While Mitchell was not experienced in the operation of the hay baling machine, he had operated it under the eye of Coleman while the latter was making observations as to defective baling by the hay baler. Coleman had carefully warned him of the danger in its operation, had asked him to disengage the clutch of the tractor while he was making adjustments and had explained that disengagement would stop both its movement and operation. The disengagement of the clutch was a simple operation and there was nothing to warn Coleman that Mitchell would fail to follow specific direction to shut off power to both the tractor and baler. If this had been done, there was no discernible risk to be assumed by Coleman. The testimony of Coleman reasonably permits an inference that he acted with due care for his own safety. The law of Tennessee, as elsewhere, provides that whether or not a plaintiff acted with due care is one for determination by the jury. Osborn v. City of Nashville, 182 Tenn. 197, 185 S.W.2d 510.

■■ With these defenses set aside, the controlling question in the case revolves about the relationship of Doane and Hughes to Coleman and to each other. The Tennessee cases have defined "agency" in its broadest sense to include "every relation in which one person acts for or represents another." Howard v. Haven, 198 Tenn. 572, 281 S.W.2d 480, 485; Gulf Refining Company v. Huffman & Weakley, 155 Tenn. 580, 297 S.W. 199. The cases largely determine that an employee status is determined by whether the alleged employer has the right of control over the method as distinguished from the results and look to such things as the right to hire and fire, to direct the manner and method of the work, as to who paid the wages, whether the pay was based upon time or by the job, whether the work was ordinary labor, or skilled labor, and who provided the tools for the work. Rose & Co. v. Snyder, 185 Tenn. 499, 514, 206 S.W.2d 897; Mayberry v. Bon Air Chemical Company, 160 Tenn. 459, 26 S.W.2d 148. See Conasauga River Lumber Company v. Wade, 6 Cir., 221 F.2d 312.

■ The doctrine of respondeat superior seems to have had two bases in Tennessee law. The first is that a principal is responsible for the tortious acts of his agent if he has a right to control the agent. National Life & Accident Insurance Company v. Morrison, 179 Tenn. 29, 162 S.W.2d 501; Gulf Refining Company v. Huffman & Weakley, supra. The second is that the principal does for himself what he does through another. Howard v. Haven, supra; Electric Light & Power Company v. Bristol Gas & Electric Light Company, 99 Tenn. 371, 42 S.W. 19. It was said in the Gulf Refining case, supra [155 Tenn. 580, 297 S.W. 201], "in every case the decisive question is, had the defendant the right to control, in the given particular, the conduct of the person doing the wrong"? By the contract between Hughes and Doane, Doane had the right to hire and fire all of the employees of the farm, including the engagement of the tenant farmers, and the right to supervise the work of both employees and tenants, and did so. It is apparent that Doane had considerable latitude in controlling employment and the manner and method of the farming

operation under the contract, so that the jury could find that Guarr and Mitchell were employees of Doane and, under appropriate instructions, that Doane was liable for the negligence of Guarr and Mitchell. But in the overall area of planning and performance a large degree of control was reserved by Hughes. The plan of operation was to be submitted to Hughes for his approval. Maintenance, repair and removal of buildings was, likewise, subject to his approval. Doane was obliged to report to Hughes periodically on the progress of the work and the condition of the farm. The wages of employees were to be paid out of the revenues of the farm belonging to Hughes. Having in mind that the written agreement was not the whole arrangement between Hughes and Doane, the jury was warranted in considering its practical construction by the acts of the parties thereto. Hughes testified that it was his understanding that if he had disapproved of the employment of Guarr, as farm manager, he would have expected that Doane would have cooperated. The testimony of Moffett, regional director for Doane, is revealing as to the understanding of the parties in construing the arrangement. It was Doane's general practice, according to Moffett, to follow the wishes of its clients, and knowing that Mr. Hughes had some very definite ideas of what he wanted done, transmitted those views to Doane and Doane tried to carry them out. He testified: "No, our interest ends when we have done what a client asks us to do * * but, in this case, it covers to seeing, it seems, the farm is operated as nearly as we know how according to Mr. Hughes' desire * * * Mr. Hughes gives his instructions to us, we give ours to Mr. Guarr." It will thus appear that a large measure of control over the operations of Doane was to be exercised by Hughes and comes within the principle enunciated in the Morrison case, that a principal is responsible for the tortious acts of his agent if he has a right to control the agent. National Life & Accident Ins. Co. v. Morrison, 179 Tenn. 29, 162 S.W. 2d 501; Gulf Refining Co. v. Huffman &

Weakley, supra, and that the principal does for himself what he does through another. Electric Light & Power Co. v. Bristol Gas & Electric Light Co., 99 Tenn. 371, 42 S.W. 19.

Doane urges upon us a principle stated in some of the Tennessee cases that an agent has no responsibility for the acts of sub-agents and, so, Doane is not liable as a matter of law for the negligence of Guarr and Mitchell, but Guarr was selected by Doane and Mitchell, originally an employee or tenant of Hughes, was retained by Doane. There was no obligation on the part of Doane to hire Guarr as farm manager or to keep Mitchell. They were in no sense sub-agents of Hughes. They were employees of Doane and the mere fact that their employment may have been subject to approval by Hughes does not place them in the category of sub-agents.

It must be remembered that Doane was a corporate entity and could act only through individuals. To hold that employees independently hired by an agent and not shown to be employees of both principal and agent are sub-agents would make all corporate servants sub-agents of the principal. We do not think that is the law of Tennessee and we find no Tennessee case that says so. In any event, there is no substantial evidence showing an employment relationship between Hughes on the one hand and Guarr and Mitchell on the other to warrant submission of the question of subagency to the jury. It is true, of course, that the wages of Guarr and Mitchell were paid out of the revenues of the farm and its profits, if any, would ultimately belong to Hughes. Such revenues were under the practical control of Doane and the wage schedule and the persons to whom wages were paid were, likewise, within its control. There is no evidence in the record that Hughes signed any pay checks. The payment of wages is but one of the secondary tests relied upon to determine the existence of the employer-employee relationship. In the Conasauga River Lumber Co. v. Wade, supra [221 F.2d 315], in reliance

upon Rose & Co. v. Snyder, 185 Tenn. 514, 206 S.W.2d 315, it was said: " ' * * This right of control is the distinguishing mark which differentiates the relation of master and servant from that of employer and independent contractor. Other factors are looked to only to aid in determining whether such right existed in a given case. * * * Wherever the defendant has had such right of control, irrespective of whether he exercised it or not, he has been held to be the responsible principal or master.' " The District Judge was not in error in concluding that Guarr and Mitchell were employees of Doane.

While the degree of control by a principal over his agent, in order to make the principal liable for the agent's acts, is not specifically indicated in any of the Tennessee cases, there is, we think, enough in the record to warrant a jury finding that Doane was under the control of Hughes in the overall operations of the farm; that Doane became the employer of Guarr and Mitchell under the doctrine of respondeat superior and that Doane was liable for the fault of Guarr or Mitchell proximately amounting to negligence. Our views are supported by Sec. 362 of the Restatement of the Law of Agency: "An agent is liable to third persons for the conduct of sub-agents and of his servants under the same conditions which make a principal liable for the conduct of an agent or servant." In its comment under that section the American Law Institute states: (a) "For some purposes, a sub-agent is an agent of the principal, since he acts on the principal's account and is subject to his ultimate control in the performance of acts done for him. He is also, however, an agent of the agent and subjects the latter to liability within the sphere of activity in which he is authorized to act, in accordance with the rules dealing with the liability of the principal for the conduct of an agent stated in Sec. 212–219."

"(b) An agent employing a servant upon the principal's affairs is subject to liability for the conduct of such a servant to the same extent as is any master."

Other contentions of the appellants have been considered and found to be without merit.

The judgments entered in the District Court are hereby affirmed.